IDAHO CONSERVATION LEAGUE;  and
The Wilderness Society, Plaintiffs,

v.

Jack Ward THOMAS, in his official capacity as Chief of the United States Forest Service;  Dan Glickman, in his official capacity as Secretary of the U.S. Department of Agriculture;  and United States Forest Service, an Agency of the U.S. Department of Agriculture, Defendants,

and

Intermountain Forest Industry Association, Defendant–Intervenor.

No.  CV 95–0425–S–EJL.

United States District Court,
District of Idaho.

Dec. 11, 1995.

Kristen L. Boyles, Patti Goldman, Sierra Club Legal Defense Fund, Inc., Seattle, WA, Laird J. Lucas, Land & Water Fund of the Rockies, Boise, ID, for plaintiffs.

Deborah A. Hill, U.S. Attorney's Office, Boise, ID, Lois J. Schiffer, U.S. Dept. of Justice, Land & Natural Resources Division, Washington, DC, Stephanie M. Parent, Ellen J. Kohler, U.S. Dept. of Justice, Environment Division, Washington, DC, for defendants.

## MEMORANDUM DECISION AND ORDER

LODGE, Chief Judge.

This action is brought pursuant to § 2001(f) of the 1995 Emergency Supplemental Appropriations for Disaster Relief and Rescissions Act ("Rescissions Act"), Pub.L. No. 104–19. The plaintiffs, Idaho Conservation League and The Wilderness Society, seek a permanent injunction preventing the Forest Service[1] from proceeding with the Thunderbolt timber salvage sale ("Salvage Sale"). The Salvage Sale is a component of the Thunderbolt Wildfire Recovery Project, as described in the Forest Service's October 5, 1995, Record of Decision (ROD).

The plaintiffs' primary claim is that the decision to proceed with the Salvage Sale was arbitrary and capricious and should be enjoined as authorized by § 2001(f). Additionally, the plaintiffs claim that § 2001(c)(1)(A) of the Rescissions Act requires that the Secretary of the Department of Agriculture, Dan Glickman, personally participate in timber salvage sale decisions, and that Secretary Glickman's failure to do so renders the Salvage Sale unlawful and invalid.

Currently pending before the court are plaintiffs' Motion for Summary Judgment, the Forest Service's Cross Motion for Summary Judgment, and the Forest Service's Motion to Strike Extra–Record Documents. For the reasons explained below, the plaintiffs' motion is denied, and the Forest Service's cross motion is granted, and the Forest Service's Motion to Strike in part granted and in part denied.

## I. BACKGROUND.

### A. The Salvage Sale.

The challenged Salvage Sale is located within the South Fork Salmon River drainage, in the Boise and Payette National Forests. This drainage lies within the geological formation known as the Idaho Batholith, an area characterized by steep, highly dissected topography and shallow soils. The drainage is environmentally significant as it provides critical habitat for endangered species of salmon. Since the 1950's, however, the drainage has suffered severe degradation due to erosion and stream sedimentation caused by mining, grazing, logging, and associated road building.

In recognition of the existing sedimentation problems and the resultant decline in fish populations, the Forest Service has determined that the primary management emphasis for the drainage is the restoration of

---

1. The plaintiffs named as defendants U.S. Forest Service Chief Jack Ward Thomas; the Secretary of the Department of Agriculture Dan Glickman, and the United States Forest Service. These defendants are referred to collectively as "the Forest Service."

harvestable populations of naturally reproducing salmon and trout. To this end, the Forest Service collaborated with other federal and state agencies, tribal councils, and private industry, to establish management goals and strict criteria to reduce sedimentation and improve water quality. The Forest Service already has spent millions of dollars toward these goals to help restore the dwindling salmon populations. Nonetheless, the drainage remains highly vulnerable to erosion, and the fisheries resource within it remains at substantial risk.

### B. The Thunderbolt Wildfire Recovery Project.

The Salvage Sale that the plaintiffs seek to enjoin is a component of the Thunderbolt Wildfire Recovery Project ("Recovery Project"). The challenged Salvage Sale proposes to log dead and imminently dead trees on 3,237 acres within this sensitive drainage, and includes logging on landslide prone riparian slopes and inventoried roadless areas. However, all trees removed will be yarded by helicopter. With the exception of 50 feet[2] of temporary road spurs, no new road construction would occur. The harvest will occur through 1996 to capture optimum timber value.

The stated purpose of the Salvage Sale is to finance the recovery projects called for in the Thunderbolt Wildfire Recovery Project ("the Recovery Project"). These projects include implementation of sediment reduction projects on specific roads and planting trees and shrubs on about 2,300 acres within the sale area, including planting on 1,214 acres of landslide-prone Riparian Habitat Conservation Areas (RHCAs).

The Recovery Project was the Forest Services' response to the massive wildfires of 1994 that burned 150,000 acres within the South Fork Salmon River watershed. The Thunderbolt wildfire itself burned 18,827 acres, including about 5,935 acres that burned at high intensity. Following the wildfires, the Forest Service completed the Thunderbolt Wildfire Landscape Assessment which examined all resources across the large fire landscape and assessed how the Thunderbolt Wildfire had affected those resources. Based on the recommendations contained in that assessment report, the Forest Service proposed the Thunderbolt Wildfire Recovery Project, the stated purposes of which are as follows:

> to improve long term fish habitat, rehabilitate existing sediment sources, improve hydrologic conditions of affected watersheds, protect long term soil productivity, promote regenerations of trees on burned areas, and recover the economic value of fire-killed and imminently dead trees as a means of financing the ecosystem restoration and sediment reduction projects.

AR Vol. 6, Tab 39, at I–6.

In March of 1995, the Forest Service issued its Draft Environmental Impact Statement (DEIS) and biological assessments for endangered species of fish and wildlife, as required by[3] Section 7 of the Endangered Species Act, (ESA), 16 U.S.C. § 1536(a)(2), and biological evaluations for sensitive plant, wildlife and fish species, including bull trout, steelhead, redband and westslope cutthroat trout, in compliance with National Environmental Policy Act, (NEPA), 42 U.S.C. §§ 4321, et seq. The Project's proposed alternative, particularly the component that proposed the Salvage Sale to finance recovery actions, drew harsh and substantial criticism from the other federal agencies having jurisdiction over the resource: the Environmental Protection Agency (EPA), the National Marine Fisheries Service (NMFS), and the U.S. Fish and Wild Service (USFWS) and the Idaho Department of Fish and Game. In the unanimous opinion of these agencies, the environmental risks posed by using salvage logging to finance restoration projects were too great to render the Project acceptable.

The EPA recommended against the Project, noting that the proposed action was

---

2. Prior to the modifications, the ROD permitted construction of 320 feet of temporary road spurs. However, as modified, only 50 feet of such construction will be required.

3. The Rescissions Act, which superceded these laws for timber salvage sales, was not signed into law until July 27, 1995.

inconsistent with collective agency decisions and resource protection goals for the South Fork Salmon River watershed. The EPA concluded that the logging sale would further aggravate the already critically degraded habitat for threatened salmon. NMFS also strongly opposed the Project, concluding that the Recovery Project, and the logging activity in particular, will likely jeopardize the continued existence of the endangered salmon and will likely result in the destruction or adverse modification of their critical habitat. The USFWS similarly opposed the salvage sale on the ground that it would likely result in adverse impacts to fish and wildlife. The USFWS opined that the proposed salvage actions would generate additional sediment in the already-impacted watershed, negating or delaying the benefits from the restoration actions. The Idaho Department of Fish and Game also criticized the proposal to use logging to fund restoration projects.

In response to these concerns, the Forest Service convened a panel [4] (the "Science Panel") consisting of experts from within the Forest Service to review the scientific merit of the material presented in the DEIS on sediment yield, sediment routing, and fisheries habitat. The charter of the Science Panel was to determine "if there was a better scientific basis for the decision and make recommendations to ensure that decisionmakers have information based on the best scientific analysis and data available." The Science Panel concluded that the Forest Service had used the best analytical methods available for estimating erosion and sediment delivery. However, the Science Panel was unable to conclude that the analysis performed could support the DEIS' prediction for long term improvement in spawning and rearing habitat of anadromous fish. In this latter regard, the Science Panel's Final Report identified six specific recommendations to address its concerns. The Science Panel's Final Report was completed and distributed to the EPA, NMFS, and the USFWS in late June, 1995.

The Forest Service considered and responded to the Panel's recommendations, and circulated its responses to the EPA, NMFS and the USFWS. The Forest Service also revised its DEIS to incorporate the additional data and analysis requested, as reflected in the Final Environmental Impact Statement (FEIS). The Science Panel reviewed the changes made between the DEIS and the FEIS and, on September 1, 1995, concluded in a memorandum that the revisions in the FEIS had addressed the panel's major recommendations. On September 12, 1995, the Forest Service released its FEIS. On October 5, 1995, the Forest Service issued its record of decision (ROD), indicating that it planned to proceed with the Salvage Sale under a modified version of the recommended alternative. On October 13, 1995, the Forest Service advertised the Salvage Sale.

The plaintiffs timely filed this legal challenge to the Salvage Sale within 15 days of the Sale's initial advertisement, as required by section 2001(f)(1) of the Rescissions Act. Pursuant to the expedited briefing schedule proposed by the parties and ordered by the court, the parties filed cross motions for summary judgment. Over the plaintiff's objection, the court granted permissive intervention to Intermountain Forest Industries Association. The court also denied the Forest Service's motion to limit review and permitted limited discovery by the plaintiffs. The court reserved its ruling on the Forest Service's motion to strike plaintiffs' extra-record documents.

On December 1, 1995, the court heard oral argument on the parties' summary judgment motions. Pursuant to section 2001(f)(5) of the Act, this court is required to issue its final decision within 45 days, or by December 11, 1995. Having considered the administrative record and the written and oral submissions by the parties, the court hereby issues the following memorandum decision.

---

**4.** Initially, a federal interagency science panel ("the Blue Ribbon Panel"), which included representatives from the Forest Service, EPA and the U.S. Fish and Wildlife Service (but not NMFS), met to review the science applied in the soils and fisheries analysis process. However, this panel could not reach consensus on a final report.

## C. The Rescissions Act.

Subsequent to the Forest Service's proposal to conduct the Salvage Sale, but prior to its decision to proceed with it, Congress passed the Rescissions Act which the President signed into law on July 27, 1995. The Rescissions Act sets forth expedited procedures pursuant to which the Secretary of the Department of Agriculture (Secretary) must prepare, advertise, offer, and award all contracts for salvage timber sales. As evidenced by the streamlined and expedited procedures for these sales, Congress' purpose in enacting the Rescissions Act was to harvest the backlog of dead and dying trees in the National Forests and other public lands. *See also* Conference Report to H.R. 1158, H.R. 104–124, 104th Cong., 1st Sess. (1995).

Paragraph (c)(1) of the Rescissions Act requires that for each timber salvage sale, the Secretary of Agriculture must prepare a document that combines the environmental assessment (EA) called for in 102(2) of NEPA, and the biological evaluation (BA) required by section 7(a)(2) of the ESA. However, such documents need consider the Salvage Sale's environmental impacts only to the extent which the Secretary, in his sole discretion, deems appropriate and feasible. § 2001(c)(1)(A). Similarly, the Secretary has sole discretion to determine the extent to which the document of his decision is consistent with any standards or guidelines from otherwise applicable forest management plans.

Paragraph (c)(4) of the Act provides that the Secretary of Agriculture "shall design and select the specific salvage timber sales to be offered *on the basis of the analysis contained in the document or documents prepared pursuant to paragraph (1)* to achieve, to the maximum extent feasible, a salvage sale volume level above the program level." (Emphasis added). However, the scope and content of such documents, and the information prepared, considered, and relied upon to reach a decision, rest within the sole discretion of the Secretary. § 2001(c)(1)(A). Finally, the documents and procedures required by the Rescissions Act are expressly deemed to satisfy all otherwise applicable federal environmental and natural resource laws, including NEPA, NFMA, and the ESA. *See* § 2001(i).

## II. JUDICIAL REVIEW.

██ Judicial review under the Rescissions Act is very limited. The district court is granted authority to permanently enjoin, order modification of, or void an individual salvage sale "if it is determined by a review of the record that the decision to prepare, advertise, offer, award, or operate such sale was arbitrary and capricious or otherwise not in accordance with applicable law (other than those laws specified in subsection (i)." 2001(f)(4). Because the Act specifically exempts the decision from otherwise applicable resource laws, and in view of the wide latitude granted to the Secretary to consider environmental impacts, the scope of review permitted by the Rescissions Act is extremely narrow.

In the instant case, the plaintiffs' challenge rests on two claims: Their first claim is that the Forest Service's decision to proceed with the Salvage Sale was arbitrary and capricious under § 2001(f)(4) of the Rescissions Act. In particular, the plaintiffs argue that the sale should be enjoined because: (1) the decision is contrary to the advice of other agencies; (2) the decision deviates from long-standing policies and standards for managing the watershed without a rational explanation for such deviation; and (3) the Salvage Sale will not raise enough revenue to fund restoration projects.

The plaintiffs' second claim is that § 2001(c)(1)(A) of the Rescissions Act requires that the Secretary of the Department of Agriculture, Dan Glickman, *personally* authorize the Salvage Sale, and that because he did not, the Salvage Sale is unlawful. The court will address these issues in turn.

### A. Was the Decision "Arbitrary and Capricious"?

██ An agency decision may be deemed arbitrary and capricious if the agency fails to consider all relevant factors, *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136

(1971), or if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency" or has failed to articulate "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *see also Natural Resources Defense Council v. EPA,* 966 F.2d 1292, 1297 (9th Cir.1992). Review under the arbitrary and capricious standard is searching and careful, but narrow, and the court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861–62, 104 L.Ed.2d 377 (1989).

▆ A deferential approach is "especially appropriate where the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir.93) (citing *U.S. v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989), *cert. denied,* 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990)). *See FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121–22, 56 L.Ed.2d 697 (1978) (where the agency's particular technical expertise is involved, the court must be particularly zealous in guarding the agency's discretion). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinion of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861 (citing *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823).

### 1. The Agency Decision Contradicts Expert Advice.

▆ In the instant case, the plaintiffs contend that the Forest Service's decision should be deemed arbitrary and capricious because it contradicts the expert advice of NMFS, the EPA, the USFWS, and the Idaho Department of Fish and Game. As noted above, all of these agencies strongly recommended against logging in the area, concluding that such action would further aggravate already degraded habitat recognized as critical to threatened salmon. It is clear, however-

er, the Forest Service is an expert on the forest management and the impact that management may or may not have on natural resources. Thus, notwithstanding substantial interagency disagreement, the Forest Service was entitled to rely on the opinions and analysis of its own experts. *Marsh,* 490 U.S. at 378, 109 S.Ct. at 1861–62. Moreover, as noted above, the Rescissions Act expressly grants the Secretary sole discretion over the information considered and relied on to reach his decision. *See* § 2001(i). Thus, the fact that other qualified experts oppose the proposed sale, by itself, does not render the decision arbitrary and capricious. *See Friends of the Earth v. Hinz,* 800 F.2d 822, 825 (9th Cir.1986).

The plaintiffs argue that the decision nonetheless should be deemed arbitrary and capricious because the Forest Service failed to explain why it rejected NMFS' conclusion that the Salvage Sale "is likely to jeopardize the continued existence of Snake River spring/summer chinook salmon and result in the destruction or adverse modification of their critical habitat."

The basis of NMFS' conclusion that the Salvage Sale will jeopardize endangered salmon and their habitat is set forth in the Draft Biological Opinion for the Thunderbolt Wildfire Recovery Project (BiOp). In the BiOp, NMFS states its belief that the Salvage Sale is likely to incrementally contribute to sediment, impair the process of large woody debris recruitment, potentially trigger a landslide by removal of live trees, and increase the probability of a fuel spill in the South Fork and its major tributary streams. A review of the record, however, demonstrates that the Forest Service addressed each of these concerns, either in the initial DEIS or else later, in the FEIS.

For example, one of NMFS' primary concerns is with the Forest Service's decision to allow harvest on landslide-prone slopes. In NMFS' view, such activity will increase the potential for landslides to deposit sediment in channels where endangered fish spawn, rear and overwinter. At the root of this concern is that removal of live but "imminently dead" trees from these areas will decrease evapotranspiration and increase soil moisture,

which in turn will increase the likelihood of landslides. The Forest Service specifically addressed this issue, but reached a different conclusion as to the risks presented by the proposed Sale. The Forest Service's discussion of the issue, and the basis for its conclusion, is expressly incorporated into its record of decision:

> Our concern over harvesting on landslide prone RHCA's centered on whether large woody debris (LWD) recruitment to streams would be significantly altered, and if removing trees with some live foliage would increase the probability of a landslide occurring. The analysis concluded that harvest activities will not significantly reduce the probability of a landslide occurring. The analysis concluded that harvest activities will not significantly reduce LWD recruitment due to full retention of trees within streamside RHCA's (300 ft slope distance either side of fish-bearing perennial streams, 150 ft along nonfish-bearing perennials, and 100 ft along intermittent streams). Headwater portions of the streams will be considered intermittent streams and protected similarly. Any debris slide occurrence on landslide prone RHCA's will be limited in size and frequency and would have to travel through the streamside RHCA's in order to deliver LWD to the stream system. Additional inventory of fire-damaged trees on landslide prone areas was completed in June. Eighty-nine percent of the trees identified for harvest have no live foliage remaining. Only four trees per acre that are scheduled for harvest have some live crown remaining (generally less than 10 percent). Based on the monitoring results of tree mortality after the 1989 Lowman Wildfire and the accuracy of the regression formula validated by that monitoring, four trees per acre may possibly live. However, the regression formula was shown to accurately predict death or survival 83 percent of the time. We have instructed personnel to prepare the timber sale contract in such a way that any tree meeting the definition of fire-killed and with live foliage remaining, would take priority for snag retention over a tree without live foliage. This will mitigate any concern in our estimation. Several research scientists (Walt Megahan, Allen Barta, and others) familiar with landslide phenomena in the Idaho Batholith concluded that helicopter will not change the probability of a landslide occurring.

AR Vol. 7, Tab 40 at 4.

The court has reviewed the FEIS and the referenced portions of the Administrative Record and concludes that the Forest Service adequately considered the issues raised by NMFS. Accordingly, the court concludes that NMFS' Biological Opinion and the concerns and recommendations contained therein, does not render the Forest Service's decision arbitrary and capricious.

Nor can the court conclude that the criticism, opinions and recommendations from the other agencies, however strong, render the Forest Service's decision arbitrary and capricious. The analysis of the impacts of helicopter salvage logging on sedimentation in the Idaho Batholith clearly falls within the Forest Service's area of expertise. Thus, the Forest Service clearly was entitled to rely on the opinions and studies of its own experts. While it properly considered the commenting agency's opposing views, the Forest Service was free to disagree with those views and to rely on its own expertise. The expert analysis referenced in the ROD and relied on by the Forest Service provides the rational connection to the Forest Service's decision to proceed, and convinces the court that the decision was not arbitrary and capricious.

### 2. *The Agency Departed from Longstanding Policy.*

█ Next, the plaintiffs assert that the Forest Service's decision to proceed with the Salvage Sale is arbitrary and capricious because it deviates from longstanding and carefully crafted agency and inter-agency policies and standards for managing the watershed, without any rational explanation for such deviation. The Forest Service readily concedes that the proposed Salvage Sale, which will log from landslide prone Riparian Conservation Habitat areas, is inconsistent with established management policies for the water-

shed. Indeed, but for the Rescissions Act,[5] the Salvage Sale could not be implemented without amending the Land Resource Management Plans (LRMPs) for the Boise and Payette National Forests.

However, the Forest Service specifically considered the existing management standards and guidelines of the LRMPs when it decided to go forward with the timber sale. It acknowledges that the LRMPs limit ground disturbing activities, such as helicopter logging, until the interim objective of providing habitat sufficient to support fishable populations of salmon and trout is met. Because the interim objective has not been met, the Salvage Sale would not be consistent with the LRMPs. However, in deciding to go forward with the restoration projects and the salvage sale, the Forest Service explained that "[m]uch of the more than 150,000 acres that burned were contiguous areas adjacent to the river," and that the impacts from these fires "resulted in a changed condition to the South Fork Salmon River basin that was unforeseen in the Boise and Payette Forest Plans." FEIS I–3.

The plaintiffs reject this explanation, claiming that the 1994 wildfires did not come as a surprise to the Forest Service. To support their position, the plaintiffs cite to the NMFS BiOp which states that the 1994 wildfires that burned in the South Fork Salmon River drainage of the Boise and Payette National Forests were within the range of disturbances envisioned in the environmental impact statements for the Boise and Payette National Forest LRMPs.

The court has reviewed the LRMPs for those forests and concludes that the analysis contained therein supports the Forest Service's position. The analysis for the Boise National Forest shows that except for fires in 1986 and 1987, which burned 35,593 and 50,962 acres, respectively, forest fires historically have burned less than 1,000 acres each year. See AR Vol. 27, Tab 204 at II–56. Although the LRMP for the Payette National Forest does not indicate the historical range, it does reflect that forest fires annually burn an average of 1,844 acres. See AR Vol. 25, Tab 202, at II–95. Upon this record, the court has little difficulty deferring to the Forest Service's view that the 150,000 acres that burned in 1994 resulted in a changed condition not foreseen in the forest plans. Accordingly, the court cannot conclude that the Forest Service's decision to alter its management to adapt to that change was arbitrary and capricious.

### 3. Using the Salvage Sale to Fund Recovery Projects.

■ Finally, the plaintiffs argue that the decision is arbitrary and capricious because the Salvage Sale will not raise enough revenue to fund the restoration projects deemed critical by the Forest Service in the FEIS or required by § 2001(c)(8) of the Rescissions Act.[6]

The Forest Service has stated that the objective of the Salvage Sale is "to recover the economic value of dead and imminently dead trees *as a means of financing activities* related to" its paramount objectives to "improve long term fish habitat, rehabilitate existing sediment sources, improve hydrologic conditions of the affected watersheds ..." AR, Vol. 6, Tab 39, at I–3.

---

**5.** Under § 2001c(1)(A) of the Rescissions Act, the Secretary is given sole discretion to determine whether the document of his decision is consistent with any standards and guidelines from management plans applicable to the National Forest lands on which the proposed salvage sale is to occur.

However, subsection 2001(l) expressly precludes such amendment: "Compliance with this section shall not require *or permit* any administrative action, including ... amendment ... in or for any land management plan ... because of implementation ... of activities authorized or required by this section...." (Emphasis added).

**6.** The Rescissions Act provides that salvage timber sales "shall not be precluded because the costs of such activities are likely to exceed the revenues derived from such activities." § 2001(c)(6). The plaintiffs contend that where, as here, the Forest Service's only justification for the salvage sale is the generation of funding for restoration projects, costs and revenues must be considered. Because the court concludes that the Forest Service's decision to use the Salvage Sale to fund restoration is not arbitrary and capricious, the court need not decide whether Rescissions Act would prohibit a contrary ruling.

The Forest Service expressly recognized that because of the delay-caused loss of merchantable timber volume, the Salvage Sale would not generate enough revenue to implement all the restoration projects contemplated in the FEIS. Thus, ROD reflects that the Forest Service reduced the acreage on which the restoration projects would be implemented. The Forest Service maintains that the Sale will raise sufficient revenue to fund those committed-to projects.

In the FEIS, the Forest Service states that funding for the restoration projects

would be derived from stumpage receipts. Stumpage receipts include purchaser credits for road reconstruction activities, Knutson–Vandenberg (KV) cooperative funds for sale area improvement, brush disposal deposits, and erosion control cooperative funds. In addition, some congressionally appropriated funds may be used to fund trailhead development and monitoring and/or supplement tree planting.

AR, Vol. 6, at IV–58.

In its ROD, the Forest Service estimated that the sale value of the Salvage Sale would be one million dollars. The high bid actually received was $1,050,710. The exhibits submitted by the Forest Service explain how the Forest Service expects these funds, and other available funds, to fund the committed-to projects.

Of the gross receipts, the Forest Service is obligated to return 25 percent to the counties as payment in lieu of taxes, or $262,677. Additionally, $299,369 of the Purchaser Credit [7] funds will finance existing road-related sediment reduction projects. Of the KV Plan funds will be used to implement additional sediment reduction projects identified in the ROD, with the balance of $152,390 available,[8] at the discretion of the responsible officials, to implement other nonessential KV projects not committed to in the ROD. The remaining commitments in the ROD not funded by

Purchaser Credit or KV Plan money will be funded through appropriated money. This includes reforestation required by the Rescissions Act.

The plaintiffs point out that the Salvage Sale revenues are insufficient to cover the costs of preparing the Salvage Sale, including the NEPA analysis and litigation. The Forest Service explains that the funds used to cover such costs were generated by past salvage sales and derived from the Forest Service's pooled Salvage Sale Fund, as expressly permitted by § 2001(b)(3) of the Rescissions Act.

The court has reviewed the financial information and calculations submitted by the parties, and the information contained in the FEIS, ROD, and the Forest Service's declarations and discovery responses in particular. Based on that review, the court is persuaded that using the anticipated revenues from the Salvage Sale, together with the financing identified in the ROD, the Forest Service will be able to fund the specific projects to which it committed in the ROD. Accordingly, the court finds that the Forest Service's decision to use the Salvage Sale to finance the restoration projects was not arbitrary and capricious.

Having determined that the Forest Service's decision to proceed with the Salvage Sale was not arbitrary and capricious, the court next turns to the plaintiffs' claim that Secretary Glickman's failure to personally participate in the decision renders the decision unlawful.

### B. Must Secretary Glickman Personally Authorize the Sale?

■ The Plaintiffs claim that § 2001(c)(1)(A) of the Rescissions Act requires the Secretary of the Department of Agriculture, Dan Glickman, to *personally* authorize the Salvage Sale, and that because he

---

7. "Purchaser Credit" means that the purchaser performs the road work prescribed in the contract, and, in return, receives a credit for the value of that work toward the total timber sale contract bid amount. In this case, $299,369 worth of sediment reduction projects ameliorate *existing* sediment problems on existing roads will be completed by the purchaser.

8. These remaining funds may also be returned to the U.S. Treasury of Salvage Sale Fund or else be used to finance a portion of the restoration efforts.

did not, the decision to proceed with the Salvage Sale is unlawful and must be voided. In response to this claim, the Forest Service asserts that the Secretary's authority to manage and supervise forest lands has been duly delegated to the Assistant Secretary pursuant to 7 CFR § 2.19(b), which is further delegated to the Forest Chief pursuant to 7 CFR § 2.60(a)(2). Therefore, the Forest Service argues, the Secretary is not required to personally authorize each salvage timber sale.

The plaintiffs concede that such delegation normally is allowed. They argue, however, that in enacting the Rescissions Act, Congress intended that the Secretary be personally accountable for timber salvage sales which adversely affect endangered species or which deviate from existing forest plans, standards and guidelines for managing the forests.

To support their interpretation, the plaintiffs rely on a remark by Senator Lieberman made on the Senate floor.

> The timber provision that finally passed contains a change over previous language to *expand the role of the Secretary of Agriculture to require his signature in order to implement new sales.* Although I do not think this is a sufficient fix to this legislation, I do think it is essential for the administration to faithfully execute this authority in order to prevent serious abuse of the legal exemptions in this provision.

141 Cong.Rec. S10465 (July 21, 1995) (remarks of Senator Lieberman) (emphasis added). Relying on this remark, the plaintiffs argue that the Rescissions Act's reference to "the Secretary" means Secretary Glickman himself, and that such authority may not be delegated.

■ However, the court agrees with the Forest Service that the Senator's remark, made on the floor on the day the Act passed, is not necessarily indicative of legislative intent. As discussed in *Davis v. City and County of San Francisco,* 976 F.2d 1536, 1553–54 (9th Cir.1992), the floor statements made by individual members of Congress have limited value in interpreting the intent of Congress as a whole. The court finds that the Senator's comment is insufficient to change the Secretary's ability to delegate his authority.

The Rescissions Act's obvious intent and purpose, as evidenced by the provisions enacted by Congress and signed into law by the President, is to facilitate and expedite salvage timber sales in the national forests and on other public lands. To require that Secretary Glickman personally accomplish what is mandated by the Rescissions Act [9] would severely thwart, if not negate, this purpose. Moreover, allowing delegation, generally permits, and may effectively cause, a more thorough examination by the decisionmaker. *Accord Ashwood Manor Civic Ass'n v. Dole,* 619 F.Supp. 52 (E.D.Penn.), *aff'd,* 779 F.2d 41 (3rd Cir.1985). For these reasons, the court concludes that the Rescissions Act does not restrict the Secretary's ability to delegate his authority. Accordingly, the plaintiffs' claim that Secretary Glickman was required to participate personally in the decision is rejected.

### III. MOTION TO STRIKE.

■ The Forest Service has moved to strike all extra-record documents submitted and referenced by the plaintiffs in their motion for summary judgment. Specifically, the Forest Service seeks an order striking Exhibits A–E, G, H, J, L–O and Q, which are attached to the Declaration of Kristen L. Boyles in Support of ICL's Motion for Summary Judgment,[10] and the Amended Declaration Cindy Deacon Williams.

The Forest Service contends that most of plaintiffs' exhibits were never sent to or received by the Forest Service, and thus could not have been considered by the decision

---

9. The Rescissions Act requires that the Secretary "prepare, advertise, offer, and award contracts" and "design and select the specific salvage timber sales to be offered." The Act does not limit the Secretary's participation to those proposed sales that threaten endangered species or violates an otherwise applicable Forest Plan.

10. Exhibits F and I are found in the administrative record. The Forest Service concedes that Exhibits K and P should have been made part of the administrative record, but were inadvertently omitted in compiling the record in an expedited fashion.

maker. The plaintiffs maintain that although they obtained most of these documents from agencies other than the Forest Service, such papers were in existence prior to the date the Forest Service issued its final decision to proceed with the Salvage Sale.

The court has reviewed the exhibits in question and the arguments presented by both counsel. The court agrees with the Forest Service that the documents which were authored by agencies other than the Forest Service and which were not sent[11] or released to the Forest Service should be stricken as such writings were not before the decision maker at the time of the decision. Accordingly, the court finds that the Forest Service's motion to strike should be granted with respect to Exhibits A, B, E, G, H, J, M, L, N, O and Q.[12]

■ Exhibits C and D come from the Forest Service itself and reflect the costs implementing the decision. The court finds that such documents should be included in the record as they more fully explain the agency's decision to use the Salvage Sale as a means of financing recovery projects. Hence, the motion to strike is denied with respect to Exhibits C and D.

■ The Forest Service also seeks to strike the Amended Declaration of Cindy Deacon Williams. The plaintiffs have offered Ms. Williams' expert declaration to show the irreparable harm posed by the Salvage Sale, and argue that such evidence is necessary for this court's consideration of the requested injunctive relief. Under the applicable standard of review in this case, the court may grant a permanent injunction only if it is determined that the decision to proceed with the challenged Salvage Sale was arbitrary and capricious or otherwise not in accordance with applicable law. Because this court has ruled against the plaintiffs on the merits of the complaint, and because the Rescissions Act expressly precludes issuance of an injunction pending appeal, the issue of irreparable harm is now irrelevant. Accordingly,

the Forest Service's motion to strike is granted with respect to the Amended Declaration of Cindy Deacon Williams.

### ORDER.

Based on the foregoing,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment and Injunctive Relief filed by plaintiffs Idaho Conservation League and The Wilderness Society (Dkt. No. 18) is **DENIED.**

**IT IS FURTHER ORDERED** that the Cross Motion for Summary Judgment filed by defendants Thomas, Glickman, and the U.S. Forest Service (Dkt. No. 33) is **GRANTED.**

**IT IS FURTHER ORDERED** that the defendants' Expedited Motion to Strike Extra–Record Documents (Dkt. No. 27) is **GRANTED IN PART, AND DENIED IN PART,** as set forth in the above memorandum decision.

---

11. The court is unable to find that Exhibit L, an unsigned letter to the Forest Service which the Forest Service denies having received, was sent to the Forest Service.

12. Exhibit Q, a letter from NMFS to other agencies, indicates that a copy was forwarded to the Forest Service. The Forest Service indicates, however, that the letter was not received by it. In either case, the court finds that the document does not add any evidence of disagreement not otherwise in the record and accordingly will order it stricken.