91 F.3d 1345
 26 Envtl. L. Rep. 21,650, 96 Cal. Daily Op.
Serv. 5822,
96 Daily Journal D.A.R. 9501
 IDAHO CONSERVATION LEAGUE; and The Wilderness Society,
Plaintiffs-Appellants,
v.
Jack Ward THOMAS, in his official capacity as Chief of the
United States Forest Service; Dan Glickman, in his official
capacity as Secretary of the U.S. Department of Agriculture;
and United States Forest Service, an agency of the U.S.
Department of Agriculture, Defendants-Appellees,
and
Intermountain Forest Industry Association, Intervenor-Appellee.
 No. 95-36293.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 10, 1996.
Decided Aug. 6, 1996.
 
 Kristen L. Boyles, Sierra Club Legal Defense Fund, Seattle, Washington, for the plaintiffs-appellants.
 Monica P. Medina, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendants-appellees.
 Bruce M. Smith, Rosholt, Robertson & Tucker, Boise, Idaho, for the defendant-intervenor-appellee.
 Appeal from the United States District Court for the District of Idaho, Edward J. Lodge, District Judge, Presiding. D.C. No. CV-95-00425-EJL.
 Before: LAY,* FERGUSON, and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 OVERVIEW
 
 1
 The Idaho Conservation League and The Wilderness Society (ICL) appeal from the district court's summary judgment in favor of Jack Ward Thomas, Chief of the United States Forest Service, in its action seeking a permanent injunction preventing the Forest Service from proceeding with the Thunderbolt timber salvage sale. We affirm the judgment of the district court.FACTS AND PRIOR PROCEEDINGS
 
 
 2
 The Thunderbolt timber salvage sale is located in the South Fork Salmon River (SFSR) drainage in the Boise and Payette National Forests in central Idaho. Historically, the river was the single largest producer of spring/summer chinook in the Columbia River Basin. However, since the 1950s, the drainage has suffered severe erosion and stream sedimentation caused by mining, grazing, logging, and associated road building. This degradation has been exacerbated by the geological formation underlying the drainage, the Idaho Batholith, which is characterized by steep, highly dissected topography and shallow soils. As a consequence, the spring/summer chinook population has suffered a drastic decline.
 
 
 3
 State and federal agencies took action to correct the problems in the SFSR. In the late 1980s, the Forest Service convened a group of scientists, timber industry officials, federal and state agencies, Indian tribes, and environmental organizations to develop a management plan for the SFSR. The group developed a set of management guidelines (South Fork Guidelines) which the Forest Service incorporated into the Payette and Boise National Forest Land Resource Management Plans (LRMPs) in 1988 and 1990, respectively.
 
 
 4
 The South Fork Guidelines established an interim fine sediment objective with a goal of fishable populations by 1997 and set forth an aggressive restoration and monitoring program. Under the guidelines, any new major land-disturbing actions are prohibited until restoration actions have improved in-river conditions. The guidelines also considered the effects of fire and the appropriate response:
 
 
 5
 Impacts from a fire, or other natural events may be unavoidable and stabilizing the source of natural disturbance is not always biologically desirable for aquatic ecosystems. More important is maintaining natural stream dynamics.
 
 
 6
 The SFSR was identified as a Stream Segment of Concern by the Idaho Division of Environmental Quality. This designation occurred because the beneficial uses of salmonid spawning and cold water biota were impaired by poor water quality. In a related action, the SFSR was designated as Water Quality Limited under § 303(d) of the Clean Water Act because it failed to meet water quality standards. In 1992 the Environmental Protection Agency (EPA) set Total Maximum Daily Loads (TMDLs), which limit sediment discharges into the South Fork Salmon River. The purpose of the TMDL is to improve spawning and rearing habitat by reducing sediment load caused by human activities. The TMDL sets a goal of 25% reduction in the sediment load attributable to human activities.
 
 
 7
 The Snake River spring/summer chinook salmon was listed under the Endangered Species Act as a threatened species in 1992, and subsequently listed to endangered in 1994. The South Fork Salmon River provides critical habitat, as designated by the National Marine Fisheries Service (NMFS), for the Snake River spring/summer chinook.
 
 
 8
 In 1994 wildfires burned over 150,000 acres in the SFSR drainage. In particular, the Thunderbolt wildfire burned 18,827 acres. According to the Forest Service, the magnitude and extent of the wildfires experienced in the summer of 1994 were significantly greater than what they had anticipated.
 
 
 9
 The Forest Service initiated an assessment of effects of the fires and possible responses, and proposed the Thunderbolt Wildfire Recovery Project, which includes the Thunderbolt timber salvage sale. The purpose of the Thunderbolt sale is:
 
 
 10
 to improve the long term fish habitat, rehabilitate existing sediment sources, improve hydrologic conditions of affected watershed, protect long term soil productivity, promote revegetation of trees on burned acres, and recover the economic value of dead and imminently dead trees as a means of financing the ecosystem restoration and sediment reduction projects.
 
 
 11
 In March of 1995, the Forest Service issued its Draft Environmental Impact Statement (DEIS) and biological assessment for endangered species of fish and wildlife, as required by[1] Section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2). The response of other state and federal agencies to the proposed salvage was almost uniformly negative. As stated by the district court in its thorough memorandum decision and order:
 
 
 12
 The Project's proposed alternative, particularly the component that proposed the Salvage Sale to finance recovery actions, drew harsh and substantial criticism from the other federal agencies having jurisdiction over the resource: the Environmental Protection Agency (EPA), the National Marine Fisheries Service (NMFS), and the U.S. Fish and Wildlife Service (USFWS) and the Idaho Department of Fish and Game. In the unanimous opinion of these agencies, the environmental risks posed by using salvage logging to finance restoration projects were too great to render the Project acceptable.
 
 
 13
 The EPA recommended against the Project, noting that the proposed action was inconsistent with collective agency decisions and resource protection goals for the South Fork Salmon River watershed. The EPA concluded that the logging sale would further aggravate the already critically degraded habitat for threatened salmon. NMFS also strongly opposed the Project, concluding that the Recovery Project, and the logging activity in particular, will likely jeopardize the continued existence of the endangered salmon and will likely result in the destruction or adverse modification of their critical habitat. The USFWS similarly opposed the salvage sale on the ground that it would likely result in adverse impacts to fish and wildlife. The USFWS opined that the proposed salvage actions would generate additional sediment in the already-impacted watershed, negating or delaying the benefits from the restoration actions. The Idaho Department of Fish and Game also criticized the proposal to use logging to fund restoration projects.
 
 
 14
 Idaho Conservation League v. Thomas, 917 F.Supp. 1458, 1461-62 (D.Idaho 1995).
 
 
 15
 The Forest Service considered and responded to the concerns expressed by these agencies, particularly EPA and NMFS. In addition, the Forest Service convened a panel[2] of its own experts to "review the scientific merit of the material presented on sediment yield, sediment routing, and fisheries habitat" in the DEIS. While the panel concluded that the Forest Service used "the best analytical methods available for estimating erosion and sediment delivery," the panel was "unable to conclude that the analysis performed could support the conclusion of long term improvement in the spawning and rearing habitat of anadromous fish," and made recommendations for improving the analysis.
 
 
 16
 The Forest Service responded to the panel's recommendations and revised its DEIS (as reflected in the FEIS) to incorporate the additional data and analysis suggested. The panel reviewed the changes and, on September 1, 1995, concluded in a memorandum that the revisions in the FEIS responded to its major recommendations.
 
 
 17
 On September 12, 1995, the Forest Service released its FEIS. On October 5, 1995, the Forest Service issued its record of decision (ROD), stating that it planned to proceed with the Thunderbolt sale under a modified version of the recommended sale. On October 13, 1995, the Forest Service advertised the Thunderbolt sale. As required by § 2001(f)(1) of the Rescissions Act, Pub.L. No. 104-19, 1995 U.S.C.C.A.N. 109 Stat. 240, 241 (to be codified at 16 U.S.C. § 1611 Note), ICL filed its challenge to the Thunderbolt sale with the district court within 15 days of its initial advertisement. On December 11, 1995, within the 45 day time period mandated by § 2001(f)(5) of the Rescissions Act, the district court denied ICL's motion for summary judgment and injunctive relief, granted the Forest Service's motion for summary judgment and granted in part and denied in part the Forest Service's motion to strike certain exhibits submitted by ICL. The district court reviewed the record under the arbitrary and capricious standard mandated by § 2001(f)(4) of the Rescissions Act and found that (1) "notwithstanding substantial interagency disagreement, the Forest Service was entitled to rely on the opinions and analysis of its own experts;" (2) the fires of 1994 caused a changed circumstance which justified the Forest Service's decision to alter its management of the South Forest Salmon River; and (3) the sale, together with other funds, would raise enough money to fund restoration projects. The district court also ruled as a matter of law that Secretary Glickman did not have to personally authorize the Thunderbolt salvage sale, and the district court struck several exhibits that ICL argued should have been part of the record. ICL timely appealed.
 
 ANALYSIS
 
 18
 On appeal ICL makes two arguments: (1) the Forest Service acted arbitrarily and capriciously in deciding to proceed with the Thunderbolt sale because the sale was against overwhelming expert agency opposition, was in contradiction of long-standing Forest Service policy, and the purpose of the sale--to raise money for restoration projects--would not be met; and (2) the Forest Service violated Section 2001(c)(1)(A) of the Rescissions Act because the Secretary of Agriculture had no role in the decision to proceed with the sale. ICL also contends that the district court erred in striking the exhibits from consideration when it ruled on the motion for summary judgment.
 
 
 19
 1. Arbitrary and Capricious Review.
 
 
 20
 While we review a grant of summary judgment de novo, Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), in Inland Empire Public Lands Council v. Glickman, 88 F.3d 697 (9th Cir.1996) we set forth the applicable standard of review under the Rescissions Act:
 
 
 21
 The Rescissions Act provides for extremely limited judicial review.... Review of salvage timber sales is ... limited in that (1) review is based on the administrative record only; (2) the standard of review is arbitrary and capricious or otherwise not in accordance with applicable law; and (3) the sale is not subject to any federal environmental or natural resources laws. Id. at 701 (quotations and citations omitted).
 
 
 22
 Applying this standard of review, we conclude that the Forest Service did not act arbitrarily or capriciously when it decided to proceed with the Thunderbolt salvage sale. We agree with the district court's findings, that, first:
 
 
 23
 the Forest Service clearly was entitled to rely on the opinions and studies of its own experts. While it properly considered the commenting agency's opposing views, the Forest Service was free to disagree with those views and to rely on its own expertise. The expert analysis referenced in the ROD [Record of Decision] and relied on by the Forest Service provides the rational connection to the Forest Service's decision to proceed, and convinces the court that the decision was not arbitrary and capricious[;]
 
 
 24
 second,
 
 
 25
 in deciding to go forward with the restoration projects and the salvage sale, the Forest Service explained that "[m]uch of the more than 150,000 acres that burned were contiguous areas adjacent to the river," and that the impacts from these fires "resulted in a changed condition to the South Fork Salmon River basin that was unforeseen in the Boise and Payette Forest Plans."
 
 
 26
 . . . . .
 
 
 27
 Upon this record, the court has little difficulty deferring to the Forest Service's view that the 150,000 acres that burned in 1994 resulted in a changed condition not foreseen in the forest plans. Accordingly, the court cannot conclude that the Forest Service's decision to alter its management to adapt to that change was arbitrary and capricious[;]
 
 
 28
 and, third,
 
 
 29
 [t]he court has reviewed the financial information and calculations submitted by the parties, and the information contained in the [Final Environmental Impact Statement], ROD, and the Forest Service's declarations and discovery responses in particular. Based on that review, the court is persuaded that using the anticipated revenues from the Salvage Sale, together with the financing identified in the ROD, the Forest Service will be able to fund the specific projects to which it committed in the ROD. Accordingly, the court finds that the Forest Service's decision to use the Salvage Sale to finance the restoration projects was not arbitrary and capricious.
 
 
 30
 Idaho Conservation League v. Thomas, 917 F.Supp. at 1464-67.
 
 
 31
 2. Role of Secretary of Agriculture.
 
 
 32
 In Inland Empire, we held that § 2001(c)(1)(A) of the Rescissions Act does not require the Secretary of Agriculture, Dan Glickman, personally to authorize salvage timber sales. 88 F.3d 697, 702 (9th Cir.1996). Thus, ICL's second argument is without merit.
 
 
 33
 3. Exhibits.
 
 
 34
 ICL also argues that certain extra-record materials were improperly excluded from consideration by the district court. The district court granted, in part, a Forest Service motion to strike certain documents submitted by ICL in its motion for summary judgment on the ground that they were not part of the administrative record. The Forest Service contended that the documents were never sent to or received by the Forest Service. ICL maintained that the documents were in existence before the final decision and should be part of the record. The district court found that "documents which were authored by agencies other than the Forest Service and which were not sent or released to the Forest Service should be stricken as such writings were not before the decision maker at the time of the decision." Idaho Conservation League, 917 F.Supp. at 1469 (footnote omitted). On this basis, the district court excluded eleven exhibits and the declaration of ICL's expert Cindy Williams. The district court denied the motion to strike as to four other exhibits, finding that these were part of the record. The district court did not abuse its discretion in granting the motion to strike.
 
 CONCLUSION
 
 35
 The district court's grant of summary judgment in favor of Jack Ward Thomas, Chief of the United States Forest Service, is AFFIRMED.
 
 
 
 *
 The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The Rescissions Act, which superceded these laws for timber salvage sales, was not signed into law until July 25, 1995
 
 
 [2]
 According to the district court, a federal interagency science panel met first to review the science applied in the soil and fisheries analysis. This panel could not reach a consensus. Id. at 1462 n. 4